Barrett, J.
The main question presented by this application is, whether an underground railroad, such as that which the petitioner contemplated constructing under what is commonly called the tunneling act of 1880 (chap. 582) is a street railroad within the meaning of article 3, section 18 of the constitution. If it is, then the petitioner concedes that that part of section 1 of the act of 1880, which substitutes the favorable determination of commissioners, when confirmed by the general term, for the consent of both the local authorities and property owners, is unconstitutional; that is, unless the provision can be severed and the substitute confined to the consent of the property owners. If unconstitutional, the application, being within the exception suggested in the Thirty-fourth Street Case (102 N. Y., 343), should be denied, for certainly legal machinery should not be set in motion to bring about a result forbidden by the organic law.
The question has been very ably and exhaustively treated by the learned counsel for the petitioner, and I confess that his argument has induced me to subject my first impression to rigid analysis. After full consideration, however, I am satisfied that a broader view should be taken of the amendment of 1874 than is thus contended for, and that it was *741 never intended to limit the wholesome provisions of article 3, section 18, to surface and elevated railroads.
Underground railroads in cities are quite gigantic enterprises, and involve as valuable franchises and as important public and private interests as any surface or elevated railroad. The mischiefs aimed at by the amendment apply-with equal and, in some respects, with greater force to underground railroads. The local authorities have a greater interest in the sewerage, water and gas systems beneath the surface than in anything upon the surface likely to be affected by a railroad. The property owners upon the line have also a deep interest in the protection of their vaults, the security of their buildings, the safety of the street surface and in the methods to be adopted, for ventilating the tunnels. The latter question is especially important in a case where, as authorized by this act (§ 1), surface openings are adopted and the ordinary street use is correspondingly limited.
And why is not an underground railroad a street railroad within both the letter and the spirit of the constitution? The petitioner says, because it is not within the popular conception of the term nor within the conception of the term drawn from legislative or official action. But the popular conception of a street railroad and the intention with which the amendment was framed and voted for, are entirely different things. The same rules of construction which are applicable to statutes govern in constitutional interpretation. The intent is to prevail over the literal meaning of words. The general purpose of the constitutional amendment, the evils which existed and-the remedy which was sought, are all to be considered. People v. Potter, 47 N. Y., 375. Now, it would be not only a narrow construction, but a very loose, uncertain and varying one, which would limit the phrase “street railroad” as embodied in this amendment to what the petitioner terms “the image responsive to the phrase ” which each voter must have had in his mind.
The intention could not have been thus to impair the usefulness of the measure, nor to limit its beneficial operation by a literal definition of the term “street railroad.” It was rather within any fair view of the entire subject to embrace every kind of street railroad, surface, elevated or underground, in the existence or non-existence of which the local authorities and the property owners might have an interest. It contemplated not only such structures and systems as had been or were then in existence, but such also as the future of science and enterprise might call into existence, however novel and however foreign to the present conception of the voter.
*742 Looked at accurately and free from the confusion of popular phraseology, an underground railroad is not beneath the street. It is beneath the surface of the street, but it is upon the street. Any depression from the surface would be equally within the reasoning that a railroad which does not rest upon the surface is not a street railroad. Whether the cut be of six inches or of six feet, whether open or closed, whether tunneled by the entire or partial retention of the surface as a vaulted ceiling, would only raise a question of degree. It is true that in the illustration of an open cut, there would be a loss to the people of the ordinary surface use, but the illustration serves when xve are in substance asked to interpolate in the amendment after the term street railroad the words “resting on the surface of the street.” There is, therefore, nothing in my judgment in the argument, from popular conception, which militates against the view that all structures making use of or resting anywhere upon the street, from the surface downward, are within the constitutional provision.
But little light is thrown upon the question by the historical reference to which our attention has been called. If the solution depended upon the phraseology of past legislation, we should say that the references which the industry of counsel has placed before us about balance each other. But the present question is not concluded by phrases in legislative acts and official reports, any more than it is by popular images responsive to the term “street railroad.” It is, indeed, of very little consequence whether the legislature in speaking of street.railroad uses the words “in the street,” or the words “upon the street.” We find the words “in,” “through,” “along,” and “upon,” running almost equivalently through past legislation. It is also natural, to find existing structures classified in particular language. But it by no means follows that it was intended to limit the operation of the amendment to structures covered by such classification. What is more important than these legislative definitions, as bearing upon the present question is the course of legislative action with regard to the consent of the local authorities and the property owners. It was to fix these vital rights, sometimes conceded and sometimes denied, to place them beyond the power of legislative infringement, that the people acted. It may safely be asserted that these were the “images” which the voters had in their minds rather than any particular motive power or style of railroad structure or system of transportation.
It was the great principle of restricting corporate aggression and expanding popular rights that was voted for and adopted. Limitation of the subjects upon which such great *743 and wholesome principles were to operate, would have been wholly inconsistent, under all the circumstances with the declaration of the principles themselves.
The doctrine of legislative exposition is also invoked by the petitioner. This is a doctrine peculiarly applicable to cases of doubt (which we do not find here),-and one which should certainly not be expanded to the extent of practically clothing the legislature with judicial functions. Where the legislation is almost contemporaneous with the constitutional provision, it is, of course, entitled to greater weight than an act passed, as was that under consideration, five years later. Indeed the only act which comes within the contemporaneous principle is the rapid transit act of 1875, and there, underground roads as well as elevated and surface roads are treated as within the constitutional amendment in question. It is fair to assume that the legislature, Avhen thus considering the great rapid transit scheme, with the amendment just adopted before it, required the same conditions to be performed by all railroads, whether above, upon or beneath the surface, because, in its judgment, the constitutioli required all such railroads to be treated alike.
Having thus concluded that the act of 1880, in the particular discussed, is unconstitutional, I do not think that the petitioner’s case is. within the principle that where part of an act is constitutional and part unconstitutional, that part which is valid should be upheld, provided it is separable from that which is invalid.
This principle would enable the petitioner to proceed under the act up to the point where an application for the appointment of commissioners is essential. It may obtain the consent of the local authorities and of the requisite number of property owners. These provisions are valid and separable frbm what follows. But when an application for the appointment of commissioners becomes necessary, the petition must take the provision on that head as it is. The court cannot sever the effect which the act gives to the confirmation of the commissioners’ judgment. We cannot say that there shall be a constitutional -effect when the act declares that there shall be an unconstitutional one. This question is not affected by the petioner’s present disclaimer.
The act does not substitute the confirmation of the commissioners’ judgment for the consent either of the local authorities or of the property owners, but for that of both. The court cannot be asked to produce this result merely because the _ petitioner protests that it will not insist upon the unconstitutional half, especially as the petitioner by no means concedes the unconstitutionality of this half, but on 4he contrary, in contending that its railroad is not a street *744 railroad at all within the amendment, necessarily assumes; the position that the legislature was not constitutionally bound to require either the consent of the local authorities or of the property owners, or any judicial substitute for the latter.
In other words, that as to underground railroads in cities, the people are as completely at the mercy of the legislature (except as to special legislation) as they were before the constitutional amendment was adopted.
For these reasons I am of opinion that the application for the appointment of commissioners should be denied.
Brady, J., concurs._